**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-61291-CV-RAR**

**LARRY DONAHILL JONES,**

       Petitioner,

**v.**

**RICKY D. DIXON, SECRETARY,**
**DEPARTMENT OF CORRECTIONS**

       Respondent.[1]

_____/

**ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

**THIS CAUSE** is before the Court upon a *pro se* Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of Petitioner's convictions and sentences entered in Broward County Circuit Court, Case No. 08-17181-CF10A, following a jury trial. *See* Amended Petition [ECF No. 8] ("Am. Pet."). Having carefully reviewed the entirety of the record, and for the following reasons, the Petition is **DENIED**.

**CLAIMS**

*Pro se* litigants "are entitled to liberal construction" of their allegations. *Mederos v. United States*, 218 F.3d 1252, 1254 (11th Cir. 2000). At the same time, a litigant bringing a habeas-related action is subject to a "heightened pleading requirement" on collateral review. *See Borden v. Allen*, 646 F.3d 785, 810 (11th Cir. 2011). This is, in part, because "[t]he § 2254 Rules and the § 2255 Rules mandate 'fact pleading' as opposed to 'notice pleading,' as authorized under Federal Rule

---

[1] The original Respondent in this case, Mark S. Inch, retired from his position as Secretary of the Florida Department of Corrections on November 19, 2021. Former Secretary Inch's successor, Ricky D. Dixon, has been automatically substituted as the Respondent. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."). The Clerk's Office is thus **INSTRUCTED** to make that modification on the docket.

of Civil Procedure 8(a)." *Id.*; *see also* Rule 2(b), Rules Governing Section 2255 Cases ("The motion must state the *facts* supporting each ground.") (emphasis added).

That construction leniency, in addition, "does not give courts license to serve as de facto counsel or to rewrite an otherwise deficient pleading in order to sustain an action." *Shuler v. Ingram & Assocs.*, 441 F. App'x 712, 716 n.3 (11th Cir. 2011). In other words, *pro se* litigants "cannot simply point to some perceived or actual wrongdoing and then have the court fill in the facts to support their claim. . . . [J]udges cannot and must not 'fill in the blanks' for *pro se* litigants; they may only cut some 'linguistic slack' in what is actually pled." *Hanninen v. Fedoravitch*, No. 08-23172, 2009 WL 10668707, at *3 (S.D. Fla. Feb. 26, 2009) (citation omitted).

After carefully reviewing the Amended Petition, Petitioner has raised the following grounds for relief:

1.  "The trial court erred by striking a juror without a sufficiently race neutral and genuine reason";

2.  Petitioner challenges the sufficiency of the evidence by claiming "the State charged [Petitioner with] 'Sexual Battery on a Person under 12' [even though] the victim was not under 12" when the events transpired;

3.  "Counsel was ineffective for fail[ing] to impeach the victim, SJ, or address [her] numerous inconsistencies in her statements, depositions, and testimony";

4.  "Counsel was ineffective for fail[ing] to present an expert witness regarding false allegations of sexual abuse by children";

5.  "Counsel was ineffective for fail[ing] to present an expert witness regarding suggestive interview techniques";

6.  "Counsel was ineffective for fail[ing] to object to the State vouching/bolstering the [victim's testimony]";

7.  "Counsel was ineffective for presenting a theory of defense that required the jury to ignore the testimony of DNA expert Heather Busch";

8.     "Counsel was ineffective for fail[ing] to object to a *Giglio*[2] violation"; and,

9.     "Counsel was ineffective for fail[ing] to argue cumulative error."

*See generally* Am. Pet.

## PROCEDURAL HISTORY

In case number 08-17181-CF10A, the State charged Petitioner with one count of sexual battery of a child under the age of 12 (Count I), four counts of sexual battery of a child between the ages of 12 and 18 in familial or custodial authority (Counts II-V), and one count of lewd or lascivious molestation on a child between the ages of 12 and 16 (Count VI). *See* Amended Information [ECF No. 17-1] at 116–18.

A jury found him guilty on all counts. *See* Verdict [ECF No. 17-1] at 120–25. The trial court adjudicated him guilty and sentenced him to life imprisonment on Count I, four thirty-year sentences on Counts II through V, and a fifteen-year sentence on Count VI. *See* Judgment [ECF No. 17-1]; Sentencing Order [ECF No. 17-1] at 129–46. The trial court ordered all sentences to run concurrently. *See* Sentencing Order.

On appeal, Petitioner raised a single issue: whether the trial court erred by striking a prospective juror absent a race-neutral and genuine reason. *See* Initial Brief on Appeal [ECF No. 17-1] at 151–99. The Florida Fourth District Court of Appeal ("Fourth DCA") affirmed without a written opinion. *See Jones v. State*, 226 So. 3d 843 (Fla. 4th DCA 2017).

In August 2018, Petitioner filed a motion for postconviction relief pursuant to Fla. R. Crim. P. 3.850. *See* Motion for Postconviction Relief [ECF No. 17-1] at 244–80 ("Rule 3.850 Motion"). The postconviction trial court denied the Rule 3.850 Motion by relying on "the reasons set forth State [sic] response." *See* Order Denying Rule 3.850 Motion [ECF No. 17-3] at 249. On appeal,

---

[2] *Giglio v. United States*, 405 U.S. 150 (1972).

the Fourth DCA affirmed the denial of the Rule 3.850 Motion, *see Jones v. State*, 270 So. 3d 1251 (Fla. 4th DCA 2019), and its mandate issued on May 24, 2019, *see* Mandate Case No. 4D18-3451 [ECF No. 17-4] at 13.

While the Rule 3.850 proceedings were pending, Petitioner also filed a *pro se* state habeas petition in the Fourth DCA in which he claimed that his conviction on Count I lacked evidence to support that the sexual battery on the victim occurred while she was under 12 years of age. *See* State Habeas Petition [ECF No. 17-4] at 15–18. The Fourth DCA summarily denied the petition. *See* Order Denying State Habeas Petition [ECF No. 17-4] at 20.

Prior to the conclusion of his Rule 3.850 proceedings, Petitioner filed his initial Petition [ECF No. 1]. He filed the Amended Petition on July 1, 2019. *See generally* Am. Pet.

## PROCEDURAL REQUIREMENTS

### A. Timeliness

Stated broadly, "a person in custody pursuant to the judgment of a State court" has a one-year period to file a habeas corpus petition. *See* 28 U.S.C. § 2244(d)(1). A limitations defense is waivable. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining the State may express its intent to "waive the limitations bar"). Here, Respondent has conceded that this action is timely filed under 28 U.S.C. § 2244(d). *See* Response [ECF No. 16] at 23. Accordingly, the Court shall treat the Petition as timely.

### B. Exhaustion

Pursuant to 28 U.S.C. § 2254(b)–(c), habeas petitioners must exhaust their claims before presenting them in a federal habeas petition. This requirement is met if a petitioner "fairly present[ed] every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral review." *See Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up). "If a petitioner fail[ed] to 'properly' present [their] claim to the state court—by exhausting

[their] claim[] and complying with the applicable state procedure—prior to bringing [their] federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim." *Id.* In other words, where a petitioner has not "*properly* presented his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

Even so, "'States can waive procedural bar defenses in federal habeas proceedings,' including exhaustion." *Vazquez*, 827 F.3d at 966 (quoting *Hills v. Washington*, 441 F.3d 1374, 1376 (11th Cir. 2006)). But "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waive[d] the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) (same).

Here, Respondent has conceded that all but one of Petitioner's claims—specifically, Claim Nine—is properly exhausted. Response at 25-26. The exhaustion issue as to Claim Nine need not be addressed, however, because the underlying merits are futile and Claim Nine is thus denied on the merits below. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

## PERTINENT FACTUAL INFORMATION

The victim testified that she lived with Petitioner and her mother from the time she was eleven years old. Trial Transcript [ECF No. 18-1] at 825–26.[3] The victim considered Petitioner, who had been in "a long-term relationship" with her mother, as if he were her stepfather. *Id.* at 826. She met Petitioner on the day she moved in with her mother. *Id.* at 827–28. After "a couple

---

[3] When referring to the trial transcript, the Court uses the page numbering set by CM/ECF in the upper right-hand corner of each page.

of weeks," as the victim testified, Petitioner began molesting her by "making noises at her," putting his hands "inside [her] pants, and "touching [her] vagina" by "touching on it" and "st[i]ck[ing] his finger" inside of it as well. *Id.* at 828–30. Petitioner reportedly said, "[T]his is good for you. Don't tell nobody, because they will be jealous of you." *Id.* at 829. The victim testified that these events first transpired sometime while she was in the fourth grade, which she repeated twice, when was eleven years old. *Id.* at 829–31, 863.

After the victim turned twelve, she said, the touching continued. *Id.* at 831. As the victim got older, the abuse escalated. For instance, the victim testified that Petitioner performed oral sex on her, when she was twelve, inside her mother's bedroom. *Id.* at 833. Petitioner told the victim not to say anything or else he would harm her family. *Id.* at 835–36.

The victim testified that Petitioner made her perform oral sex on him at the age of twelve. *Id.* at 842. Later, when the victim was thirteen years old, Petitioner reportedly put his penis inside her vagina. *Id.* at 838. She testified this was the first time she had vaginal intercourse. *Id.*

The final incident of molestation, the victim said, occurred when the victim was fifteen years old. *Id.* at 843. At trial, the victim testified that Petitioner drove her to an alley, instructed her to take off her pants, and "stuck" his penis into her vagina. *Id.* Petitioner, during this incident, removed his penis from the victim's vagina and forced her head down so that he could put his penis into the victim's mouth. *Id.* at 843–44. Petitioner, then, ejaculated into her mouth. *Id.* at 844–45. Petitioner turned around to clean himself with a rag, and the victim spit out his semen onto her "Winnie the Pooh" shirt because she planned "to tell someone" about the molestation with evidence of semen on her clothing. *Id.* at 844, 846. The victim, soon after, told her school guidance counselor thereby prompting police involvement. *Id.* at 847. During cross-examination, the victim said she had a "packet" of all her prior statements, which she reviewed from "time-to-

time." *Id.* at 862.  And her inconsistencies over the years, on several issues, were drawn out by Petitioner's Counsel. *Id.* at 849–66

The victim's mother testified that she was romantically involved with Petitioner for four years. *Id.* at 875.  The victim's mother never noticed anything unusual about the relationship between the victim and Petitioner. *Id.* at 879.  The victim's mother, though, remembered one incident where Petitioner left the home with the victim to pick up ice—a trip that the victim's mother said should have taken fifteen minutes to complete—because that outing took more than two hours and the victim "went straight . . . to the bathroom" to take a shower upon her arrival. *Id.* at 881.  The shower, the victim's mother testified, was unusual because the victim "took a shower *before* she left" with the Petitioner. *Id.* (emphasis added).  In other words, as the victim's mother pointed out, the victim took two showers approximately two hours apart. *Id.*  This incident transpired "two weeks prior to when [Petitioner was] arrested." *Id.* at 885.

After the victim reported the rape to law enforcement, and after the victim's mother discovered her daughter's accusations, the victim handed her mother a shirt "in a bag." *Id.* at 882-83.  This shirt, as the victim's mother described, had "a cartoon character" from "Disney" on it. *Id.* at 883.  When she handed her mother the bagged shirt, the victim retrieved it from the bottom of a laundry basket that only the children used. *Id.* at 858, 883.  The victim told her mother that Petitioner's semen was on the shirt; the victim's mother called law enforcement. *See id.* at 883–84.

Fort Lauderdale Police Department Officer Jody Thomforde testified that, as a school resource officer, she interviewed the victim about her reported molestation. *Id.* at 949–51.  Officer Thomforde asked "basic questions" and "confirmed the allegation" of sex abuse. *Id.* at 952.  The victim, riding in a police vehicle, directed Officer Thomforde and a detective to the alleyway where she stated the abuse occurred. *Id.* at 952–53.

Fort Lauderdale Police Detective Brice Brittenum also testified that the victim told him about the abuse. *See id.* at 961–63. The jury heard an audio playback of Detective Brittenum's interview of the victim. *See id.* at 965–99. Detective Brittenum identified a pink Winnie the Pooh shirt and acknowledged he received it from the victim's mother. *Id.* at 1002-03. Detective Brittenum found Petitioner's DNA on the shirt. *Id.* at 1004. He also acknowledged that children are "very suggestible" and, for that reason, he tries "to ask open-ended questions" when interviewing children. *Id.* at 1009.

Fort Lauderdale Police Detective Colin Cowderoy testified that he prepared the swabs for initial DNA testing of the victim's "pink" "Disney shirt." *Id.* at 1030–32, 1034. From there, these swabs were submitted to a laboratory. *Id.* at 1036. DNA examiner Heather Busch testified that she—within reasonable scientific certainty—found Petitioner to be "the source of the DNA" with the swabs taken from the Winnie the Pooh shirt and a DNA swab from the Petitioner. *Id.* at 1059. She found no foreign DNA on the swabs. *Id.* Busch further testified, on cross-examination, that she is qualified to test who wore the shirt (*i.e.*, "wear DNA"); she did not conduct such testing because her testing was "limited" by what law enforcement sent her for testing. *See id.* at 1063–64. She also stated that she "did not see the shirt." *Id.* at 1064.

Jean Swaby, a nurse practitioner at the Nancy J. Cotterman Center, testified that she performs exams on patients who are brought in for allegations of sexual assault. *Id.* at 891–92. Swaby stated that she could never conclusively say whether a girl or woman has had sex based on a vaginal examination. *Id.* at 905. However, Swaby examined the victim and observed "tearing of [the victim's] hymen." *Id.* at 909. The location of the tearing, as Swaby testified, "indicated . . . there was penetration at some time" and that the victim likely was not a virgin. *Id.* at 911.

## GOVERNING LAW

### A. *Standard of Review*

"As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Some of the more restrictive limits are found in § 2254(d). Under that provision, a federal court may grant habeas relief from a state court judgment only if the state court's decision on the merits was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Consequently, § 2254(d) constructs a "highly deferential standard for evaluating state-court rulings" because, after all, this standard "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

"A state court's decision is 'contrary to' federal law if the 'state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Consalvo v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 842, 844 (11th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)) (brackets omitted). A state court's decision qualifies as "an unreasonable application of federal law if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Consalvo*, 664 F.3d at 844 (quoting *Williams*, 529 U.S. at 413) (cleaned up). "'If this standard [seems] difficult to meet'—and it is—'that is because it was meant to be.'" *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

By its own plain terms, § 2254(d)'s deferential standard applies only when a claim "was adjudicated on the merits in State court proceedings[.]"  § 2254(d); *see also Cullen*, 563 U.S. at 181 ("If an application includes a claim that has been adjudicated on the merits in State court proceedings, § 2254(d), an additional restriction applies."); *Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA.").  The summary denial of a claim with no articulated reasons presumptively serves as an adjudication on the merits subjecting the claim to § 2254(d)'s additional restrictions.  *See Richter*, 562 U.S. at 100 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").  This is because federal courts ordinarily presume that § 2254(d)'s deferential standard applies when a constitutional claim has been presented to a state court and denied in that forum.  *See, e.g.*, *id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

At the same time, "federal court[s] should 'look through' [an] unexplained decision to the last related state-court decision that *does* provide a relevant rationale" if one exists.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (emphasis added).  From there, federal courts "presume that the unexplained decision adopted the same reasoning."  *Id.*  "[T]he State may rebut [that] presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed."  *Id.*

On the other hand, if a federal habeas court reaches the merits of a claim that was not adjudicated on the merits by a state court, then "the claim is reviewed *de novo*."  *See Cone*, 556

U.S. at 472; *see also Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*[.]") (cleaned up).

Lastly, courts may even engage in *de novo* review of a claim because a claim that is meritless under *de novo* review certainly cannot survive the strictures of § 2254(d) if it applies. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review."); *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1109–10 (11th Cir. 2012) ("We need not resolve the question of the proper standard of deference to the Florida Supreme Court's adjudication . . . Instead, we adopt an approach the United States Supreme Court itself has employed when a petitioner fails to show prejudice even under *de novo* review[.]"); *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014) ("Such a showing is not enough to establish ineffectiveness under a *de novo* application of *Strickland*—much less justification for upsetting the Georgia high court's decision under § 2254(d)(1).").

### B. *Ineffective Assistance of Counsel*

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. Const. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced

his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88).

Regarding the deficiency prong, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take" during the proceedings. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). If "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" counsel did not perform deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong, "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A defendant, though, must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable[,]" in order to satisfy the prejudice prong. *Strickland*, 466 U.S. at 687.

## ANALYSIS

### A. *Ground One*

In Ground One, Petitioner alleges that the trial court erred by permitting the State to exercise a peremptory challenge against Juror Merriman without "a sufficiently race neutral and genuine reason" for doing so. Am. Pet. at 3. Petitioner has not identified how his claim is constitutional in nature. And, on this basis, the claim could be denied as not cognizable in this proceeding. *See Holsey v. Thompson*, 462 F. App'x 915, 917 (11th Cir. 2012) (holding issues of state law are not cognizable).

Even if the Court were to rewrite this claim to Petitioner's benefit, it does not fare any better. The Court begins by noting that Petitioner raised this issue on direct appeal, *see generally* Initial Brief, where the Fourth DCA considered and summarily rejected it in an unreasoned opinion, *see Jones v. State*, 226 So. 3d 843 (Fla. 4th DCA 2017).

Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986), *holding modified by Powers v. Ohio*, 499 U.S. 400 (1991). As such, "the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause." *Id.* at 89. "[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96.

"To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* (internal citation omitted). Assuming a defendant makes a prima facie showing, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* at 97. "The trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98; *see also Bui v. Haley*, 321 F.3d 1304, 1313-14 (11th Cir. 2003) (same).

To establish a prima facie case, the defendant must prove that the venire member "is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race" and "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire [member] from the [panel] on account of [his] race." *Batson*, 476 U.S. at 96 (citation omitted).

The State's proffered explanation need not be "persuasive, or even plausible[,]" because the Court only concerns itself—at least at this stage—with "facial validity." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (cleaned up).  In other words, "the reason will be deemed race neutral" "[u]nless a discriminatory intent is inherent in the prosecutor's explanation." *Id.* at 768.  Then, "the persuasiveness of the justification becomes relevant" because it is at this final step during "which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id.*

Turning to this case, during voir dire, defense counsel explained to the venire that they were required to presume Petitioner's innocence.  *See* Trial Transcript [ECF No. 18-1] at 105.  When questioning Juror Ball, she responded that she could be "neutral," but she was somewhat inconsistent about whether she could presume that a defendant is innocent. *Id.* at 300–02.  Defense counsel later moved to strike Juror Ball for cause because she showed no commitment as to whether she could follow the presumption of innocence—only that she could remain "neutral." *Id.* at 323.  The trial court agreed to strike her for cause; however, the State interjected and asked to re-question her for clarification.  *Id.*

Upon re-questioning, Juror Ball averred that she understood the presumption of innocence. *See id.* at 324.  When Juror Ball exited the courtroom, the trial court struck her for cause for two reasons.  *See id.* at 325–26.  One, the trial court still found a "discrepancy" as to whether she could commit to factfinding with a presumption towards innocence.  *Id.*  And two, the trial court found Juror Ball had a "very silly" disposition because she was "laughing" when asked whether she wanted to serve as a juror.  *Id.*

Later, the State moved to use a peremptory strike on Juror Merriman.  *See id.* at 469. Defense counsel objected to the motion and requested a race-neutral reason because Juror Merriman—like Petitioner—was black.  *Id.* at 469–70.  The prosecutor responded that she noticed

Merriman "laughing" and with her eyes "closed" during voir dire. *Id.* The trial court allowed the prosecutor to bring Merriman in for questioning, which led to the following exchange:

> PROSECUTOR: One of the questions I asked you about is whether there are good police officers, bad police officers, and I noticed you were smiling about that. What are your thoughts on weighing the credibility of police officers?
>
> MERRIMAN: There's some good ones, there's some bad ones.
>
> PROSECUTOR: Have you ever had a bad experience with a police officer?
>
> MERRIMAN: No.
>
> PROSECUTOR: Okay. So what was it about that question that would make you laugh?
>
> MERRIMAN: I didn't really laugh. I just smiled about it.
>
> PROSECUTOR: I'm sorry?
>
> MERRIMAN:[4] I didn't really laugh. I just smiled.

*Id.* at 471-472. Merriman also acknowledged that she had been arrested. *Id.* at 473. The prosecutor noted that Merriman "laughed again" during the re-questioning, and Defense counsel acknowledged that she "smile[d]." *Id.* at 474. The trial court ultimately granted the strike, finding the State's reasoning to be "genuine" and "race-neutral." *Id.* at 479.

To begin, "a determination of a factual issue made by a State court shall be presumed to be correct" in this action. 28 U.S.C. § 2254(e)(1). And the Petitioner bears "the burden of rebutting [that] presumption of correctness by clear and convincing evidence." § 2254(e)(1). That being said, since the trial court found the State had a non-racial and genuine reason to strike Juror Merriman, the Court begins with a presumption that this finding was correct. Petitioner, here, has offered very little to rebut that presumption.

---

[4] The transcript's reference to a "Debra N. Heller" appears to be a typographical error. [ECF No. 18-1 at 472].

To support his contention, Petitioner attempts to point out a perceived inconsistency between the State's treatment of Juror Merriman and Juror Ball.  Am. Pet. at 3.  For two reasons, this comparison is tenuous.  First, Petitioner's Counsel never highlighted this alleged discrepancy in treatment, so the trial court—and, thus this Court—have no explanation as to why the State moved to strike Juror Merriman and fought to keep Juror Ball. Because Petitioner can only speculate as to why the State did so, Petitioner cannot meet his burden of rebutting that presumption of correctness.

Second, and similarly, there is no indication in the record that the State saw Juror Ball laugh.  Perhaps, if the State had seen Juror Ball laughing, the State would have moved to strike Juror Ball for the same reasons it sought to strike Juror Merriman.  Petitioner, therefore, has not rebut the presumption of correctness.  By failing to rebut that presumption, Petitioner has failed to meet his burden of purposeful discrimination.  *See United States v. Houston*, 456 F.3d 1328 (11th Cir. 2006); *see also Purkett*, 514 U.S. at 768-69 ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike").  In short, regardless of whether § 2254(d)'s deferential standard applies, this claim fails because it would fail even under *de novo* review.  *See Hittson*, 759 F.3d at 1248.

### B.  *Ground Two*

Petitioner, in Ground Two, claims the State charged him with sexual battery on a person under 12 even though the victim was not under 12 during the timeframe listed in the Amended Information.  Am. Pet. at 4.  Liberally construed, Petitioner appears to contend that the Amended Information—charging Petitioner with sexual battery on a person under the age of 12—was erroneous because the victim's birth date indicates she would have been over the age of 12 when the sexual battery on a person under the age of 12 occurred.

Petitioner does not identify a constitutional basis for this claim. *See* Am. Pet at 4. It is his burden to do so. *See Borden*, 646 F.3d at 810 (detailing heightened pleading requirement). And, therefore, the Court has sufficient grounds to deny this claim on this basis alone. *See Holsey*, 462 F. App'x at 917 (holding issues of state law are not cognizable under federal habeas review).

Petitioner's averments are also refuted by the record. This is because the victim was born on April 17, 1993, and the Amended Information charging Petitioner with sexual battery on a person less than 12 years of age identified the crime as occurring "on one or more occasions on or between the 11th day of December, 2004, and the 16th day of April, 2005." Amended Information. Of course, since April 16, 2005 is 11 years, 11 months, and 30 days from the victim's April 17, 1993 birthdate, Petitioner lacks a factual predicate to support this claim.

To the limited extent Petitioner challenges the sufficiency of the evidence to convict him on sexual battery upon a child under twelve years of age (Count I), which charged him for digitally penetrating the victim's vagina, this does not change anything. True, the victim's mother testified that she began a relationship with Petitioner in December 2005—a date that would suggest sexual battery on the victim, before she turned twelve, was an impossibility. But Petitioner faces one enormous hurdle. On federal habeas review, "[w]hen the record reflects facts that support conflicting inferences, there is a presumption that the jury resolved those conflicts in favor of the prosecution and against the defendant." *Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir. 2001). "In other words, federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and in weighing the evidence." *Id.*

Here, there is conflicting evidence. The victim stated Petitioner "stuck his finger up [her] vagina" when she was eleven years old. *Id.* at 830. How does she remember being eleven years old and not, say, twelve years old? According to the victim, she knew she had moved in with her mother at age eleven because of three unrelated, but memorable, events: (1) she "first" resided

with her mother *at* age eleven; (2) her grandmother "passed away" around the time she turned twelve *while* she was already residing with her mother; and (3) the move to her mother's residence required her to "switch schools." *Id.* at 830. And Petitioner started touching the victim's vagina "a couple of weeks" after she moved in with her mother. *Id.* at 825, 828–29.

Since there was *some* evidence that the victim was age eleven when Petitioner digitally penetrated her vagina, this claim must be denied even if § 2254(d)'s more onerous standard did not apply. *See Hittson*, 759 F.3d at 1248.

### C. Ground Three

In Ground Three, Petitioner contends his Counsel was ineffective for failing to adequately impeach the victim as to her inconsistencies at trial. Am. Pet. at 5–6. These inconsistencies, to summarize Petitioner's allegations, pertain to the victim's testimony concerning (i) her age at the time of the first incident of molestation; (ii) her age on the first incident of oral sex; (iii) her age when "full sex" first transpired; (iv) where Petitioner ejaculated during certain encounters; (v) the frequency of the sexual encounters; and (vi) locations and other details of specific encounters. *Id.*

Petitioner raised this claim in his Rule 3.850 Motion. *See* Rule 3.850 Motion at 246–63. As stated earlier, the postconviction trial court denied the Rule 3.850 Motion by incorporating the reasons set forth in the State's Response. *See* Order Denying Rule 3.850 Motion. In its Response, the State argued as follows:

> Looking to the record and cross examination of the victim, counsel attempted to hone in on the victim's inconsistent statements made during the police interview and the trial. Counsel first had the victim commit she had not made any false statements to the police in her interview on September 8, 2008. Counsel established the defendant was fifteen (15) years old when she made the statement to the police and was twenty-two (22) years old at the time of trial. Counsel tried to establish the unlikelihood of having sex with the defendant hundreds of times. Counsel cross-examined the witness on inconsistencies as to when the last time intercourse with the

defendant occurred. Counsel inquired of the victim when she first had anal sex with the defendant. Counsel questioned the victim about the Winnie the Pooh t-shirt, as well as the bedsheet and other clothes. Counsel tried to point out the police found issues with her account of what happened, and suggested the police did not find her truthful. Defense counsel cross-examined the victim on the first time she had full sex with the defendant. At the end of the cross-examination, counsel conferred with the defendant, and then counsel stated on the record he had no further questions.

During the trial, counsel also delved into the victim's inconsistent statements during cross examination of the victim's mother, Nurse Jean Swaby, and Detective Brittenum. Counsel looked to discredit the findings of the State's expert DNA witnesses. Throughout closing, counsel directed the jurors' attention to the victim's inconsistencies, shortcomings of the police investigation and the sexual assault treatment center ("SATC"), and to the lacking of testing for DNA evidence.

The record is conclusive that counsel cross-examined the victim on many of the inconsistencies defendant alleges counsel did not address, and for those not addressed counsel made an educated decision that going into such areas would not be fruitful for the defense. As referenced in *Puglisi, supra,* it is the defense attorney who chooses the trial strategy. In the instant case, the record reflects counsel's reasonable trial strategy was to discredit the victim through her inconsistent statements and also by highlighting her inconsistencies through her mother's testimony, and the testimonies of the lead detective and the SAIC nurse. Counsel also looked to create reasonable doubt in the jurors' minds by addressing a lack of scientific evidence.

* * *

In this circumstance, the record is clear and conclusive that counsel's trial strategy was sound and within the norms of reasonable professional assistance. The defendant failed to demonstrate that if counsel had questioned the victim on the additional items he suggests in his motion that the result would have been different. The defendant failed to prove deficiency by counsel, and certainly has not established any prejudice if counsel had been deficient. As such, the defendant's Ground 1 is conclusively refuted by the record and the law and must be summarily DENIED.

State's Response to Rule 3.850 Motion [ECF No. 17-1] at 289–91 (cleaned up & errors in original).

The Fourth DCA affirmed the denial of the motion without a written opinion. *See Jones v. State*, 270 So. 3d 1251 (Fla. 4th DCA 2019).

The Court must presume the Fourth DCA's silent decision is an adjudication on the merits. *See Gill v. Mecusker*, 633 F.3d 1272, 1288 (11th Cir. 2011) ("The state appellate court's affirmances warrant deference under AEDPA because the summary nature of a state court's decision does not lessen the deference that it is due.") (cleaned up).  The Court, then, must "look through" the Fourth DCA's silent affirmance to the postconviction trial court's reasoning as the Fourth DCA's presumptive reasoning.  *See Wilson*, 138 S. Ct. at 1192 ("We hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").  Here, because the postconviction trial court incorporated the State's Response, the Court presumes the Fourth DCA likewise adopted that same reasoning on the merits.  *See id.* This claim, therefore, is subject to § 2254(d)'s deferential standard.

The record confirms that Counsel questioned the victim on her previous inconsistent statements to police.  This included her statements to police that (i & iii) Petitioner began having penile-vaginal intercourse with her at the age of 11 and that (v) Petitioner had sex with the victim ten times a day for years.  *See* Trial Transcript at 851-66.

True, Counsel did not explicitly question the victim as to (ii) the first time she performed oral sex on Petitioner, (iv) inquire as to where Petitioner ejaculated on or in her person, or (vi) draw out other inconsistencies that she has made over the course of recounting these events over the years.  This arguably was a reasonable decision.  The victim admitted that she had studied "all" of her prior statements, which the State Attorney arranged in a "packet" for her to review, and she agreed that she had read this packet "from time-to-time."  *Id.* at 861–61.  That admission demonstrates that Counsel had to make a decision.

There are, broadly speaking, two options that a competent attorney could have taken. Option One: Press the victim on some of those unaddressed inconsistencies in the hopes of further

impeachment even though it risked the victim curing her prior inconsistencies with her studied review of the record.  Option Two: Opting not to question the victim on every inconsistency, thereby leaving the jury with a permissible inference that the victim's testimony—after rereading her prior statements—was scripted.  This second option would have been particularly reasonable because it did not risk the curing of inconsistencies.[5]  A "reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" so the Court cannot say Counsel performed deficiently here.  *Waters*, 46 F.3d at 1512 (cleaned up).

Although that would be enough to deny this claim, *see Hittson*, 759 F.3d at 1248, the Court stresses that this claim is subject to a § 2254(d)'s deferential standard.  The Fourth DCA, as previously stated, presumptively adopted the State's Response to the Rule 3.850 Motion, meaning that it reasoned "[C]ounsel cross-examined the victim on many of the inconsistencies defendant alleges counsel did not address, and for those not addressed counsel made an educated decision that going into such areas would not be fruitful for the defense."  State's Response to Rule 3.850 Motion at 290.

The Court, of course, begins with a presumption that Counsel's performance was reasonable.  *See Maharaj v. Sec'y, Fla. Dep't of Corr.*, 432 F.3d 1292, 1318 (11th Cir. 2005) ("A reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") (cleaned up).  Because this claim is viewed through the deferential lens of § 2254(d), the Court's presumption that Counsel performed reasonably is "doubly so."  *Richter*, 562 U.S. at 105 (internal quotation marks omitted).

---

[5] Counsel, in addition, successfully managed to lead the victim into admitting that the events were "so long ago" so she was unable to "remember what grade" she was in or even "the ages" of "when" certain acts transpired.  Trial Transcript at 864.

How attorneys cross-examine witnesses is an archetypical example of an attorney strategy. *See Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) ("The decision as to whether to cross-examine a witness is a tactical one well within the discretion of a defense attorney.") (cleaned up); *Chandler v. United States*, 218 F.3d 1305, 1318 (11th Cir. 2000) ("[C]ounsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable."); *Sirias v. Sec'y, Fla. Dep't of Corr.*, No. 2:14-CV-23-FTM-29CM, 2015 WL 5440336, at *19 (M.D. Fla. Sept. 15, 2015) ("Because there were sufficient strategic reasons for counsel to forego a more aggressive cross-examination of the victim, Petitioner cannot satisfy *Strickland*'s performance prong, and he is not entitled to federal habeas relief."). Indeed, it is beyond question that "[t]he decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel." *Blanco v. Singletary*, 943 F.2d 1477, 1495 (11th Cir. 1991).

There is no disputing, then, that the Fourth DCA's presumptive reasoning as to the performance prong was reasonable. *See Maharaj*, 432 F.3d at 1318 ("[T]he Florida Supreme Court did not apply a rule that contradicts Supreme Court case law, nor did it arrive at a result contrary to one reached by the Supreme Court in a case with materially indistinguishable facts. Additionally, the state court's application of that correctly–stated law was altogether reasonable.").

Petitioner also cannot show the Fourth DCA's prejudice analysis was unreasonable. *See generally* State's Response to Rule 3.850 Motion at 291 (showing the State's Response asserted there was no prejudice). For three reasons, it is clear to this Court that the prejudice prong was not unreasonably resolved by Florida's courts. First, the victim's credibility was already in doubt because of her admission that she reviewed all her prior (inconsistent) statements before testifying at trial. Second, and as previously mentioned, asking the victim to elaborate on certain details may

have opened the door to her curing some of those inconsistencies.  Third, in a sensitive case like this one, aggressive cross-examination of an alleged sex-abuse victim could inadvertently alienate jurors prior to deliberations.  Petitioner, as such, cannot show the Fourth DCA's resolution of the prejudice prong was unreasonable.  *See Maharaj*, 432 F.3d at 1318.  Accordingly, this claim is denied.

### D.  Grounds Four and Five

Petitioner, in Ground Four, claims that his Counsel was ineffective for failing to present an expert regarding false allegations of sexual abuse by children.  Am. Pet. at 7.  In his words, Petitioner claims his Counsel could have called "Dr. Larson, who would have been able to testify to high rates of false reporting" in sex abuse cases.  *Id.*  Ground Five is similar.  Therein, Petitioner avers that Counsel was ineffective for failing to present an expert witness regarding suggestive interview techniques.  *Id.* at 9.

Expert testimony—put forth to assist the jury's credibility of a victim—"is improper, in both state and federal trials" because it invades the jury's ability to fairly review the credibility of an alleged sex-abuse victim.  *See Snowden v. Singletary*, 135 F.3d 732, 738 (11th Cir. 1998) (citing *United States v. Azure*, 801 F.2d 336, 340–41 (8th Cir. 1986)).  In any event, the proposed expert testimony would have had little to no effect.  To illustrate, Petitioner's convictions partially relied on the fluids found on the victim's Winnie the Pooh shirt.  And the expert testimony regarding the locations of where the victim's hymen had torn gave the jury additional evidence to find penetrative acts of some kind had transpired.  The proposed expert testimony on false reporting and suggestive interview techniques, in other words, could not rebut (or even address) the physical

evidence tending to corroborate the victim's account.  *See Strickland*, 466 U.S. at 694 (defining prejudice).

In any event, this claim is entirely speculative because the mere fact that some experts might hold such positions says nothing as to whether said experts would find suggestive interview techniques or false reporting at issue in *this* case.  *See, e.g.*, *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit.  A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (cleaned up); *Duran v. Walker*, 223 F. App'x 865, 875 (11th Cir. 2007) ("Duran's claim that an expert witness would have prompted the jury to believe his testimony and disregard the statements he made during the police interview is conclusory and speculative, and does not amount to a showing of prejudice.").

Because Petitioner cannot meet his burden under a *de novo* standard, he certainly has not met his burden under § 2254(d)'s deferential standard for Grounds Four and Five if it applies.  *See Hittson*, 759 F.3d at 1248.  Grounds Four and Five are, therefore, denied.  The Court need not address the performance prong.  *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.")

### E.  Ground Six

Petitioner, in Ground Six, advances another claim of ineffective assistance at trial by claiming his attorney failed to object to the State's vouching and bolstering of the victim during closing argument, specifically when the prosecutor said the victim "was honest and straightforward."  Am. Pet. at 10.

Prosecutors can advance arguments on a witness's credibility. *See, e.g., United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991) ("[T]he prohibition against vouching does not forbid prosecutors from arguing credibility which may be central to the case."). The jury, in this case, heard Counsel's cross-examination, pointing out the victim's inconsistencies. *See* Trial Transcript at 849–66. These issues were also drawn out by Counsel during closing argument. *See id.* at 1137. As for the challenged remarks themselves, Petitioner overlooks the context. The record demonstrates that the prosecution characterized the victim as "honest and straightforward" *while* conceding that the victim's recounting was imperfect due to, as the State argued, the passing of time. *See id.* at 1115-16.

Petitioner, therefore, cannot show the remarks he complains of "rose to the level of fundamental error" and, in turn, cannot show Counsel's failure to object could allow the Court to deem Counsel's performance ineffective. *Chandler v. Moore*, 240 F.3d 907, 914 (11th Cir. 2001). The trial court, moreover, twice instructed the jury that the attorneys' arguments are not evidence. *See* Trial Transcript at 800, 920. Presumptively, the jury followed the trial court's instructions. *See Jamerson v. Sec'y, Fla. Dep't of Corr.*, 410 F.3d 682, 690 (11th Cir. 2005). Petitioner has not identified any evidence to suggest the jury shrugged off its obligation to adhere to those instructions. *See Strickland*, 466 U.S. at 694–95 ("[A] court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law . . . . The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). Petitioner, then, cannot show prejudice. *See id.*

Therefore, because Petitioner cannot meet his burden of proving either *Strickland* prong, even under *de novo* review, he certainly cannot meet his burden under § 2254(d) if it applies. *See Trepal*, 684 F.3d at 1109–10. Consequently, this claim must be denied.

### F. *Ground Seven*

In Ground Seven, Petitioner claims his Counsel "was ineffective for presenting a theory of defense that required the jury to ignore the testimony of DNA expert Heather Busch." Am. Pet. at 11. Counsel, as Petitioner submits, claimed "there was no DNA" because there was no test showing Petitioner's DNA on the shirt—even though Busch had concluded that the samples taken from the shirt derived from semen. *Id.*

During opening statement, Counsel asserted that the jury would see the police investigation was insufficient and thus the "DNA [was] *essential*[*ly*] meaningless." Trial Transcript at 818. Counsel, in support, submitted that there was no test to show what type of fluid was found on the victim's shirt. *Id*. at 819. During closing arguments, Counsel argued the following regarding the DNA evidence presented:

> Did anybody test -- let me clarify my DNA comments. You know I stated there was never any testing to determine what the -- whether it was semen or what type of fluid it was that ultimately was positive for DNA.
>
> Doctor Tracey testified that if you test a spot, you're not testing for a certain type of fluid. DNA testing doesn't test for serums or serology. It doesn't differentiate between spit, sweat, semen. None of it. Because they are taking a sample so small that whatever they hit in that area of the sleeve could be any of the three.
>
> When I cross examined him, just to clarify what their expert, Miss Busch said, he said if you were going to do a test to really try to figure out what type of fluid it was that tested positive, you would need to get the microscope out and you would need to examine it, and then you can get like a pretty good idea, but you could never be certain of what it was.
>
> But it doesn't matter in this case, because our examiner, Miss Busch, did not do the test.
>
> So, what was on the sleeve? How did it get there? We have to, basically, have to take the word of [the victim]. That's it.
>
> It's not a shirt that appears to have fit her. They didn't test any other part of the shirt. The DNA expert -- she said, she was wearing the shirt. The expert could have verified that for us and tested to see who was wearing the shirt. Didn't. Only did exactly what [the victim] and her mother told the detective to do. The detective did whatever they said, without ever questioning them. Not in the slightest bit.

Trial Transcript at 1132-33.

Counsel, therefore, acknowledged that Busch testified that the fluid on the shirt was seminal fluid but chose to attack the thoroughness of her methods to discredit her testimony that Petitioner was the source of that fluid. This makes sense. Had Counsel simply accepted Busch's testimony without challenging it at all, that strategy would have been patently unreasonable because the DNA evidence was instrumental to corroborating the victim's testimony.

"There are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. That is why "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Courts also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* After all, "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

On this record, the Court sees no other reasonable defense that Counsel could have used to parry the State's DNA evidence. By contesting the sufficiency of Busch's methods, and arguing that the victim cannot be trusted to testify as to what fluid is on the sleeve, Counsel's performance was simply not outside the "wide range of reasonable professional assistance." *Id.* Even if Counsel's performance could somehow be deemed unreasonable for "ignoring" the testimony of Busch, Petitioner has not met his burden on the prejudice prong. Petitioner has not stated what alternative argument Counsel should have pursued, nor shown any such defense would have been accepted by the jury. Stated plainly, Petitioner has never said how his DNA and (perhaps) his semen stained the victim's Winnie the Pooh shirt *and* why there is a reasonable probability that the jury would have accepted that post hoc explanation over the victim's account. *See Strickland*, 466 U.S. at 694. Petitioner has thus asked the Court to indulge in pure conjecture and supplant a

defense on his behalf.  This the Court cannot do.  *See generally Hanninen*, 2009 WL 10668707 at

*3.  Prejudice, therefore, has not been shown.  *See Strickland*, 466 U.S. at 694.

To summarize, because Petitioner cannot meet his burden on either *Strickland* prong under

the more lenient *de novo* standard, the Court is certain he cannot meet his burden under § 2254(d)

if it applies.  *See Trepal*, 684 F.3d at 1109–10.

### G. *Ground Eight*

Turning to Ground Eight, Petitioner contends that his Counsel was ineffective for failing

to object to a *Giglio* violation.  Am. Pet. at 12.  In support, he avers the State *elicited* testimony

from the victim that he did not have anal sex even though the State knew that the victim previously

told Nurse Swaby that Petitioner had "put his penis in her butt."  *Id.*

In *Giglio v. United States*, the Supreme Court held that when the prosecution solicits or

fails to correct known false evidence, due process requires a new trial where "the false testimony

could in any reasonable likelihood have affected the judgment of the jury."  405 U.S. at 154.  "To

establish a *Giglio* claim, a habeas petitioner must prove: (1) the prosecutor knowingly used

perjured testimony or failed to correct what he subsequently learned was false testimony; and (2)

such use was material, i.e., that there is any reasonable likelihood that the false testimony could

have affected the judgment."  *Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1348 (11th

Cir. 2011) (quotation marks and ellipsis omitted).

Review of the record confirms that prior to trial, the State filed a *Brady*[6] notice, notifying

the defense that the victim admitted that Petitioner *never* had anal sex with her.  *See* Brady Notice

[ECF No. 17-1] at 111.  The State also amended the original information to remove a count

predicated on allegations of anal penetration.  *Compare* Initial Information [ECF No. 17-1] at 29–

32, *with* Amended Information.

---

[6] *Brady v. Maryland*, 373 U.S. 83 (1963).

The disclosure, if anything, helped the defense at trial. At trial, Counsel discredited the victim's testimony by first having her say Petitioner had anal sex with her when she was thirteen years old and that "most of the time" Petitioner had vaginal sex with her he "also had anal sex" with her. Trial Transcript at 856. The record confirms, then, that the defense—not the prosecution—elicited the testimony on anal sex. On re-direct examination, the prosecutor questioned the victim about her knowledge of the definition of "anal sex," and she responded that she understood the word anus to mean vagina. *Id.* at 867. She also admitted that Petitioner never "put his penis in [her] butt." *Id.*

There is nothing in the record suggesting the prosecution knowingly used perjured testimony or failed to correct testimony at trial. To the contrary, the defense's strategy was to elicit that testimony because it painted the victim as a liar and forced the prosecution to direct the victim to back-peddle her untrue trial testimony. The strategy, of course, backfired.[7] Counsel was not ineffective for failing to raise a futile *Giglio* objection, particularly because Counsel provoked the testimony in question and the prosecution had the victim admit that Petitioner never penetrated her anus. *See Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had *no effect on the judgment*.") (emphasis added); *Pinkney v. Sec'y, Fla. Dep't of Corr.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for

---

[7] Strangely, before she denied having anal sex with Petitioner, the victim said that "most of the" incidents during which she had vaginal sex with Petitioner she had anal sex too. Trial Transcript at 856. The Court views that testimony as strange because the victim was age twenty-two at trial and later purported not to understand the difference between her vagina and her anus. To the limited extent Petitioner might later claim that the prosecution's failure to correct the witness as to her perjured testimony, as required by *Giglio*, is evident because it is incredible to believe the victim did not know the scientific term for these orifices, such a claim would fail. This is because the victim's testimony was not "material" for *Giglio* purposes. One, the State no longer sought any counts for acts involving anal sex with the victim. And two, that unusual testimony likely favored the defense because it weakened the victim's credibility and strengthened the defense's argument that she was very suggestible. Consequently, since Counsel's *Giglio* objection would have failed on materiality, a *Giglio* objection would have been futile. *See Strickland*, 466 U.S. at 691.

failing to perform a futile act, one that would not have gotten his client any relief."); *Hamner v. Deputy Sec'y of Fla. Dep't of Corr.*, 438 F. App'x 875, 880 (11th Cir. 2011) ("[C]ounsel could not be deemed ineffective for failing to raise a futile hearsay objection.").

Because Petitioner cannot meet his burden under *de novo* review, he cannot meet his burden under § 2254(d) if it applies.  *See Trepal*, 684 F.3d at 1109–10.  Ground Eight is thus denied.

### H. *Ground Nine*

Lastly, in Ground Nine, Petitioner says his "Counsel was ineffective for failure to argue cumulative error" based on the previously mentioned "errors."  Am. Pet. at 14.  If Petitioner is arguing that his Counsel's cumulative errors prejudiced him, that claim has no basis in law.

"The Supreme Court has not addressed the applicability of the cumulative-error doctrine in the context of ineffective-assistance-of-counsel claims, [but] the Court has held, in the context of an ineffective-assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how *specific* errors of counsel undermined the reliability of the [proceeding].'"  *Wood v. Sec'y, Fla. Dep't of Corr.*, 793 F. App'x 813, 818 (11th Cir. 2019) (quoting *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984)) (citations omitted, emphasis added).  Since there is no Supreme Court precedent recognizing an ineffective-assistance claim predicated on non-reversible cumulative errors, and *Strickland* typically demands specific errors to be at issue, this claim is not cognizable and, in the alternative, is denied.

Here, there is no indication that Counsel's cumulative actions or inactions amount to ineffective assistance.  *See Hunt v. Comm'r, Ala. Dep't of Corr.*, 666 F.3d 708, 731–32 (11th Cir. 2012) ("Even if we were to determine that clearly established federal law mandates a cumulative-effect analysis of ineffective-assistance claims, Hunt would not be entitled to relief: he has not shown that in this case the cumulative effect of counsel's alleged errors amounted to ineffective

assistance."). Alternatively, if Petitioner is—as he has written—claiming that his *trial counsel* failed to point out his own underlying cumulative errors, that claim is meritless and perplexing. It is meritless because the Court has not found any error, much less any that affected Petitioner's trial. *See, e.g.*, *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) ("Because we have found only one error, which we hold to be harmless, there can be no cumulative error."). And it is perplexing because ineffective-assistance at trial claims, which form the majority of Petitioner's claims here, ordinarily are raised on postconviction, not by trial attorneys. *See generally Sneathen v. Sec'y, Fla. Dep't of Corr.*, 787 F. App'x 567, 572 (11th Cir. 2019) ("Florida prisoners ordinarily must present claims of ineffective assistance of trial counsel in their first motion for postconviction relief."). No matter how the Court construes this claim, then, it must be denied.

## EVIDENTIARY HEARING

No evidentiary hearing is warranted in this matter. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Cullen,* 563 U.S. at 183 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). Because the Court has resolved the ineffective assistance of counsel claim contained in Ground Three under § 2254(d), evidentiary development is unwarranted. *See Williams*, 529 U.S. at 444 ("The Court of Appeals rejected this claim on the merits under § 2254(d)(1), so it is unnecessary to reach the question whether § 2254(e)(2) would permit [or restrict] a hearing on the claim."). The Court has further assured itself that all other claims do not warrant evidentiary development. *See Schriro*, 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

## CERTIFICATE OF APPEALABILITY

After careful consideration of the record in this case, the Court declines to issue a certificate of appealability ("COA").   A habeas petitioner has no absolute entitlement to appeal a district court's final order denying his habeas petition.   Rather, to pursue an appeal, a petitioner must obtain a COA.  *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180, 183 (2009).

Issuance of a COA is appropriate only if a litigant makes "a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   To do so, litigants must show that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  And "[w]here a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'"  *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)).

Here, reasonable jurists would not find the Court's resolution of the merits debatable or wrong.  The only claim worth addressing further is Ground Three.  Ground Three is not entitled to a certificate of appealability because, while some attorneys may have acted differently than Petitioner's counsel, reasonable jurists would not find debatable whether Petitioner can meet his burden under § 2254(d) as to both *Strickland* prongs.   A COA as to all claims is, therefore, denied.

## CONCLUSION

Having carefully reviewed the record in this case, and for the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Amended Petition [ECF No. 8] is hereby **DENIED**.  Any pending motions are **DENIED as moot**.  Further, any demands for an evidentiary hearing are **DENIED**, and a COA is **DENIED**.  Accordingly, this case is **CLOSED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 13th day of January, 2022.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

cc:    Larry Jones, *pro se*
       counsel of record